[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 4, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-12276
_____

D. C. Docket No. 99-00003-CR-3-RV

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEFFERY SCOTT DURHAM,
a.k.a. William Anthony Dezarn, etc.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(April 4, 2002)**

Before TJOFLAT, BARKETT and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Jeffery Scott Durham appeals his conviction on multiple counts of armed bank robbery, possession of a firearm during a crime of violence, and possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g), 924(c),(e), and

2113(a),(d). Durham argues that his due process and Sixth Amendment rights were violated when he was forced to wear a restraining device referred to as a "stun belt" during his trial. After reviewing the briefs and the record, and after the benefit of oral argument, we find that the district court did not make findings on the record sufficient to justify the use of this extraordinary security measure. The government has not demonstrated that this error was harmless. Therefore, we vacate Durham's conviction and remand the case to the district court for further proceedings consistent with this opinion.

## BACKGROUND

In a nine-month span beginning in February of 1998, armed robbers attacked a bank in Gainesville and two banks in Pensacola, Florida. The gunmen raided the vault at two of the three banks, and made off with a total of close to $500,000 from the robberies. While no one was killed or seriously injured at any of the banks, the robberies were nonetheless quite violent. In one instance, the robbers tied up the bank's employees and held them at gunpoint for some forty-five minutes while the gunmen attempted to locate the combination to the bank's vault.

In December of 1998, Durham was arrested in California after it was determined that he was wanted for numerous bank robberies throughout Florida,

including the three robberies described above. Durham was promptly transferred to the Middle District of Florida to face charges related to a bank robbery there.

While awaiting the disposition of those charges, Durham attempted to escape from the Tampa jail where he was being held. Durham managed to slip out of a set of leg irons using a key he concealed on his person, and proceeded to scale an eight-foot interior fence topped with razor wire. Durham jumped from the fence onto an armed corrections officer, and attempted to wrestle the officer's shotgun away from him. During the struggle, the officer was able to toss the shotgun over an adjacent fence. Durham then climbed the exterior fencing to an outside wall and jumped to the ground, where he was apprehended by other deputies.

Durham eventually pled guilty to the pending robbery and weapons charges in the Middle District of Florida and received a 330-month term of incarceration in December of 1999. Durham was soon transferred to the Northern District of Florida to face charges related to the 1998 bank robberies in Gainesville and Pensacola. In January of 2000, Durham was charged in the Northern District of Florida on eight counts of armed robbery, possession of a firearm by a convicted felon, and possession of a firearm during a crime of violence.

During his pre-trial detention in a Pensacola jail, Durham plotted yet another escape attempt. In a letter to his sister (concealed in some legal materials mailed to

3

his former attorney), Durham provided detailed instructions on how to mail him a set of hacksaw blades without the blades being discovered. After being confronted with the letter, Durham confessed to planning his escape, and revealed a number of specific details about the plan.

Courtroom security personnel, aware of Durham's recent history of escape attempts and the violence of his alleged crimes, decided to take substantial security precautions before bringing Durham into the courtroom for his trial. Durham's legs were to be shackled and he was to wear a "stun belt" throughout the trial. A stun belt is a device placed around the defendant's midsection that uses an electric shock to temporarily disable the defendant if his actions pose a security threat. The belt is controlled by a remote device held by a security official in the courtroom. If the belt is activated, the defendant will receive a powerful electric shock sufficient to temporarily incapacitate him.

Upon becoming aware of the court's intention to use the stun belt at trial, Durham filed a motion seeking to prohibit its use. In this motion, Durham began by making several factual claims about the operation of a stun belt. Durham claimed that most stun belt models were designed to administer from 50,000 to 70,000 volts of electricity sustained over an eight-second period. Shock of that magnitude "typically causes the recipient to lose control of his limbs, to fall to the

ground, and often to defecate or urinate upon himself." Durham requested an evidentiary hearing to confirm these claims and to explore a number of other questions relating to the operation and physical effects of the stun belt.[1]  Durham also argued that the stun belt interfered with his rights to confer with counsel and to participate in his own defense.[2]  He further noted that a stun belt may prejudice the defendant in front of the jury, as the belt's presence may imply that the defendant is a violent individual that can only be controlled through extraordinary means.

On February 7, 2000, Durham's trial was slated to begin.  That morning, the court held a hearing outside of the presence of the jury to resolve several pretrial motions.  The first issue the court took up regarded Durham's motion to prohibit the use of the stun belt.  Durham's attorney began the argument by reiterating his factual claims about the power and devastating effects of the stun belt.  He

---

[1] For example, Durham sought information about the error rate of the device, the criteria for triggering the belt,  medical evidence that the shock would cause no long-term physical damage to the recipient, and information on the training of the deputy with responsibility for activating the belt.

[2] Durham's basis for these arguments is rooted in the fear and anxiety he alleges the stun belt creates. He asks, "[h]ow is a defendant to understand the assurance that he can, for example, consult with counsel, if the assurance comes at the price of unremitting fear and uncertainty that the very act of consultation may be misinterpreted as 'inappropriate behavior,' and precipitate a shock?"

proceeded to argue that he feared that Durham would be "more concerned about receiving such a jolt than he is about thinking about the testimony and giving me aid and assistance in the defense of this case." Durham's attorney also made the less compelling argument that the device interfered with Durham's comfort, as the belt pinched the small of Durham's back whenever he leaned forward in his chair.

The government responded by mentioning Durham's attempted escapes from the Tampa and Pensacola jails, and argued that the stun belt was necessary to protect the security of those in the courtroom.[3] Durham's attorney then reiterated his point that the belt would adversely affect his ability to confer with his client.

Following this colloquy, the court addressed the arguments by stating to Durham's attorney, "I don't know if it's interfering with your ability to communicate with [Durham]. He's right beside you and you can communicate with him, but it obviously may interfere with his comfort." The court went on to state that "there is no doubt in my mind that Mr. Durham has a heightened security risk above average for a criminal trial. I don't know that there is any – well, I'm

---

[3] The government also mentioned that it intended to show that Durham concealed a handcuff key on his person after he was arrested in California. The government did not note that the key was apparently used in Durham's Tampa escape attempt.

not sure if there are alternative ways that they can attach this device, other than on his back."

For the remainder of the hearing, the court briefly addressed two questions: the possibility of attaching the device in a different manner, so as to minimize Durham's discomfort, and whether there was any possibility of an accidental discharge. The court did not receive evidence on these questions, but asked several questions of the deputy marshal that had responsibility for courtroom security.[4] The deputy assured the court that the belt was attached properly and that it could not be adjusted to increase Durham's comfort. When asked about the possibility of accidental discharge, the deputy stated, "We take precautions in that, Your Honor, and we are all trained in how it operates, and there won't be any mistakes. And if it goes off, Mr. Durham is aware and advised of the rules and regulations of how it works." After hearing this statement, the court issued its ruling on Durham's motion to prohibit the use of the stun belt, stating the following:

> [T]he motion has to be denied, Mr. White. Certainly, on balancing the interest, I think that this is a minimal intrusion into the defendant's normal liberties of exercising his arms and sitting in the chair. And I don't find that there is any rational basis for him to be unduly apprehensive so as to in any way interfere with his ability to participate and advise you as part of his defense. So the motion is denied.

---

[4]The deputy marshal was not under oath when he responded to the judge's questions.

7

Other than the conclusion that Durham was a "heightened security risk" and that there was "no rational basis for him to be unduly apprehensive" about the belt's discharge, the court did not make any factual findings to justify its denial of Durham's motion. The court found no facts regarding the operation of the stun belt or the potential for accidental discharge. The court did not explain why less severe security methods – such as shackles alone – would have been inadequate to restrain Durham. The court also provided no guidance to Durham on what behavior would prompt the deputy to activate the stun belt.

Shortly after the ruling denying Durham's motion, the jury trial began. On February 9, 2000, Durham was convicted on all eight of the counts listed in the indictment. Durham was sentenced to a total of 1,265 months of imprisonment, to run consecutive to the 330 month sentence already imposed in the Middle District of Florida. Durham timely filed the instant appeal of his conviction and sentence.

DISCUSSION

A.

Durham raises eight distinct claims of error in the instant appeal. We will consider only the first of these claims – that the district court erred in requiring Durham to wear a stun belt throughout the guilt phase of his trial.[5]

We have never addressed whether the use of this particular restraint in a given set of circumstances violates any of a defendant's trial rights. However, we have a substantial body of case law addressing how other sorts of security measures affect a defendant's trial rights. This body of law offers pertinent guidance in our analysis of this case of first impression.

A district court retains "reasonable discretion" to determine whether or not to physically restrain a criminal defendant. *United States v. Mayes*, 158 F.3d 1215, 1225 (11th Cir. 1998). The district judge is ultimately responsible for ensuring "the safe, reasonable and orderly progress of trial," and shackling or otherwise restraining a criminal defendant may occasionally be the only way to achieve this

---

[5]The other issues Durham raises for our consideration are whether: (1) the district court erred in failing to suppress the fruits of a particular search; (2) the Supreme Court's opinion in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), requires that several of his convictions be vacated; (3) the evidence was sufficient to support certain of his convictions; (4) the jury instructions were erroneous; (5) the prosecutor made an improper closing argument; (6) the court erred in denying Durham's request for a continuance before sentencing; and (7) the sentence imposed was improper. As we are vacating Durham's conviction, we need not consider any of these claims.

goal. *United States v. Theriault*, 531 F.2d 281, 284 (5th Cir. 1976).[6]   Trial judges

are to be accorded reasonable discretion to balance the interests involved and to

decide which measures are necessary to ensure the security of the courtroom; our

review is limited to determining whether that discretion was abused. *Id*.

In assessing whether the district court abused its discretion in this context,

we must turn to a set of principles developed in earlier cases concerning the use of

physical restraints (primarily leg shackles) upon the defendant at trial.  First of all,

we have long held that such physical restraints should be used as rarely as possible.

*See Allen v. Montgomery*, 728 F.2d 1409, 1413 (11th Cir. 1984) ("We agree that

seldom will the use of handcuffs be justified as a courtroom security measure.");

*Zygadlo v. Wainwright*, 720 F.2d 1221, 1223 (11th Cir. 1983) ("Many

considerations dictate that the use of shackles to restrain a defendant at trial should

rarely be employed as a security device.").  The Supreme Court has held that the

presumption of innocence is an integral part of a criminal defendant's right to a fair

trial. *Estelle v. Williams*, 425 U.S. 501, 503 (1976).  The presence of shackles and

other physical restraints on the defendant tend to erode this presumption of

innocence. *Mayes*, 158 F.3d at 1225.  Shackles and gags visible to the jury "might

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as precedent all decisions of the former Fifth Circuit issued prior to September 30, 1981.

10

have a significant effect on the jury's feelings about the defendant." *Illinois v. Allen*, 397 U.S. 337, 344 (1970).

Even if the physical restraints placed upon the defendant are not visible to the jury, they still may burden several aspects of a defendant's right to a fair trial. In *Zygadlo*, we noted that leg shackles "may confuse the defendant, impair his ability to confer with counsel, and significantly affect the trial strategy he chooses to follow." 720 F.2d at 1223. Physical restraints also damage the integrity of criminal trials in a less tangible, but no less serious, way; they are "an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Allen*, 397 U.S. at 344.

The importance of these considerations dictates that the imposition of physical restraints be subject to careful judicial review. We have held that a decision to apply leg shackles to the defendant "must be subjected to close judicial scrutiny to determine if there was an essential state interest furthered by compelling a defendant to wear shackles and whether less restrictive, less prejudicial methods of restraint were considered or could have been employed." *Elledge v. Dugger*, 823 F.2d 1439, 1451 (11th Cir.) (per curiam) (citations omitted) (internal quotation marks omitted), *withdrawn in part*, 833 F.2d 250 (11th Cir. 1987). In order to determine whether the district court abused its discretion to

11

impose particular security measures, the district court is required to place the reasons for its decision to use such measures on the record. *Theriault*, 531 F.2d at 285.

The principles outlined above were developed in response to different sorts of physical restraints (leg shackles, handcuffs, gags, etc.) than are at issue in the instant case. We have never addressed whether the use of stun belts to restrain criminal defendants raises the same set of constitutional concerns as do other physical restraints. Our first task is thus to assess whether stun belts impose the same sorts of burdens on a defendant's trial rights as do other restraints. We can then determine whether the district court's imposition of this security measure is within the outer boundaries of its discretion.

### B.

There is no testimony in the record from a single sworn witness about the operation of the stun belt, nor are there any findings of fact on the issue. We therefore have nothing in the record that provides us with a factual basis for assessing how the belt operates. Our discussion of the relationship between the principles outlined above and the use of this restraint will thus rely on Durham's uncontested claims about certain of the stun belt's basic operational facts.

Durham's primary factual claims about the belt are the following: (1) when activated, it administers a 50,000-70,000 volt shock for approximately eight seconds, (2) the power of such a shock causes the wearer to lose control of his limbs, and often to urinate or defecate on himself, and (3) the belt protrudes some three inches from the wearers back, causing some degree of discomfort to the wearer. Durham also contends that the belts have been known to malfunction, and that there have been several instances where the device has accidentally been triggered during trials.

One of the most prominent concerns about the use of most methods of restraint comes from the possibility of prejudice to the defendant if those restraints are visible to the jury. *Elledge*, 823 F.2d at 1454 (Edmondson, J., concurring in part and dissenting in part) ("[T]he single major analytic thrust of all the guilt-innocence phase cases is . . . whether the defendant's right to a presumption of innocence was infringed by the security measure adopted by the trial court" (footnote omitted).). In the case of stun belts, this would seem to be less of a concern than it generally is with other physical restraints. As we understand it, stun belts are worn underneath the prisoner's clothing, and are not readily visible to the jury. Other restraints (such as handcuffs or gags) are not so easily concealed, and the possibility of prejudice is more obvious in such cases.

13

Nonetheless, if the stun belt protrudes from the defendant's back to a noticeable degree, it is at least possible that it may be viewed by a jury. If seen, the belt "may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant." *State v. Flieger*, 955 P.2d 872, 874 (Wash. Ct. App. 1998). The use of a stun belt as a security device undoubtedly raises some concern about possible prejudice to the defendant, and this is a concern that needs to be considered before the device is imposed on a defendant. However, it is notable that a stun belt likely poses fewer problems in this regard than do other, more obvious methods of restraint.

We are more concerned about the possibility that a stun belt could disrupt a different set of a defendant's constitutionally guaranteed rights. In *Zygadlo*, we pointed out that leg shackles may "impair [the defendant's] ability to confer with counsel." 720 F.2d at 1223. A stun belt seemingly poses a far more substantial risk of interfering with a defendant's Sixth Amendment right to confer with counsel than do leg shackles. The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial – including those movements necessary for effective communication with counsel.

Another problem with this device is the adverse impact it can have on a defendant's Sixth Amendment and due process rights to be present at trial and to participate in his defense.[7]  Wearing a  stun belt is a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case.  It is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt.  A defendant is likely to concentrate on doing everything he can to prevent the belt from being activated, and is thus less likely to participate fully in his defense at trial.  We have noted that the presence of shackles may "significantly affect the trial strategy [the defendant] chooses to follow." *Id*. A stun belt is far more likely to have an impact on a defendant's trial strategy than

_____

[7]The cases in this area have focused on situations in which the defendant is absent from substantive portions of his trial. *See, e.g.*, *United States v. Brantley*, 68 F.3d 1283, 1290–91 (11th Cir. 1995) (assessing constitutional effect of defendant's absence during jury instructions; framing the right as a defendant's "right to be present" and locating right in the Sixth Amendment, the due process clause of the Fifth Amendment, and Rule 43 of the Federal Rules of Criminal Procedure).  The reason that the defendant's involuntary absence from his trial is problematic is largely because the defendant's absence nullifies any opportunity for him to participate in his own defense.  *United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir. 2001) ("a client's active assistance at trial may be key to an attorney's effective representation of his interests").  Presence at trial is meaningless if the defendant is unable to follow proceedings or participate in his own defense.  Mandatory use of a stun belt implicates this right, because despite the defendant's physical presence in the courtroom, fear of discharge may eviscerate the defendant's ability to take an active role in his own defense.

15

are shackles, as a belt may interfere with the defendant's ability to direct his own defense.

Finally, stun belts have the potential to be highly detrimental to the dignified administration of criminal justice. In *Allen*, the Supreme Court found the presence of shackles on a defendant posed "an affront to the . . . dignity and decorum of judicial proceedings." 397 U.S. at 344. Shackles are a minor threat to the dignity of the courtroom when compared with the discharge of a stun belt, which could cause the defendant to lose control of his limbs, collapse to the floor, and defecate on himself.

Thus, stun belts plainly pose many of the same constitutional concerns as do other physical restraints, though in somewhat different ways. Stun belts are less visible than many other restraining devices, and may be less likely to interfere with a defendant's entitlement to the presumption of innocence. However, a stun belt imposes a substantial burden on the ability of a defendant to participate in his own defense and confer with his attorney during a trial. If activated, the device poses a serious threat to the dignity and decorum of the courtroom.

Therefore, a decision to use a stun belt must be subjected to at least the same "close judicial scrutiny" required for the imposition of other physical restraints. *Elledge*, 823 F.2d at 1451. Due to the novelty of this technology, a court

16

contemplating its use will likely need to make factual findings about the operation of the stun belt, addressing issues such as the criteria for triggering the belt and the possibility of accidental discharge.[8]  A court will also need to assess whether an essential state interest is served by compelling a particular defendant to wear such a device, and must consider less restrictive methods of restraint.  Furthermore, the court's rationale must be placed on the record to enable us to determine if the use of the stun belt was an abuse of the court's discretion.  *Theriault*, 531 F.2d at 285.

## C.

Applying these principles to the instant case, it is apparent that the district court did not take the steps necessary to justify using a stun belt to restrain Durham at trial.

---

[8] The manner in which most security measures (such as shackles or handcuffs) operate is self evident, so an evidentiary hearing before imposition of these restraints is not necessary unless there is a factual dispute over the visibility of the restraints or the need for the security measures.  When unusual restraints such as a stun belt are suggested, however, there are likely to be substantial factual questions relating to its basic operation and use.  Questions such as the criteria for triggering the belt, the force and effect of the shock it administers, and the training of those activating it are highly relevant to any effort to understand the nature of the burden this technology imposes on a defendant's rights.  Thus, due to the novelty of this technology, evidentiary hearings are almost certainly necessary before a decision to employ a stun belt can be supported – unless a defendant fails to raise factual questions about how the device operates.

First, the district court did not make any findings on critical factual matters relating to the operation of the stun belt. Durham's motion to prohibit the use of the stun belt asked for an evidentiary hearing, at which testimony could be heard on what sort of device to was to be employed in this case, the error rate of the belt, the criteria for triggering the device, and the medical effects the discharge of the belt may have on an individual's physical health. The degree to which the belt infringes upon a defendant's constitutional rights is dependent upon an answer to such questions; without knowing how the belt works and how it will affect the defendant, any assessment of the burdens that it may impose are conjectural. However, the district court made no supportable findings on even the most basic of the factual issues related to this restraint.

For example, in both his motion to prohibit the use of the stun belt and in his argument at the pretrial hearing, Durham's attorney expressed concern about the possibility of an accidental triggering of the belt during trial. If the device were to be triggered accidentally, the result would be an egregious breach of both appropriate courtroom decorum and Durham's most fundamental trial rights. The likelihood of an erroneous discharge of the belt is certainly a factor that needs to be weighed carefully in any decision to employ this technology.

Yet, in the instant case, the court made no relevant factual findings on this issue. Indeed, the only "testimony" relevant to these questions came from an unsworn deputy marshal who stated, "We take precautions in [preventing accidental triggering], Your Honor, and we are all trained in how it operates, and there won't be any mistakes. And if it goes off, Mr. Durham is aware and advised of the rules and regulations of how it works."

This response raises many more questions than it answers. Exactly what precautions does the Marshals Service take to ensure the belt does not go off accidentally? What kind of training does the deputy with the remote trigger receive? How is it relevant that after the device is triggered, presumably sending Durham to the floor in pain, he is aware of "the rules and regulations" of how the belt operates? The unsworn comments made by the deputy marshal are simply not sufficient to provide any relevant answer to the question of the likelihood of accidental discharge.

The possibility of an accidental activation is only one of numerous factual questions that a district court needs to address before imposing this novel security device. The decision to employ the belt in this case is difficult to support without a record establishing basic facts relevant to the belt's operation.

Second, the court did not, on the record, consider any less restrictive alternatives to prevent escape and ensure the safety of those in the courtroom. Durham was wearing leg shackles in addition to the stun belt; the court did not explore the possibility that leg shackles alone would be sufficient.[9]  The court's inquiry at the pretrial hearing was dedicated exclusively to questions surrounding the stun belt – no other methods of restraint were considered on the record.  This failure to address the possibility of less restrictive alternatives on the record makes it much harder for the district court to justify the imposition of such an unusual and burdensome security measure.

Finally, the holding in *Theriault* requires the district court to articulate, on the record, a rationale for its decision to impose particular security measures.  *Id*. In the instant case, the district court stated that the stun belt was a "minimal intrusion" on the defendant's "normal liberties," and that the defendant had no basis for any apprehension about the belt's interference with his rights.  In the

---

[9]The court had little basis for finding leg shackles alone inadequate to secure the courtroom in this case.  The government made an oblique reference to the fact that Durham had concealed a handcuff key after being arrested in California, but did not expand on this fact.  The concealed key allegation may have formed an appropriate basis for an inquiry into whether shackles alone would be sufficient to protect the security of those in the courtroom. However, this is an inquiry the court never made.  The court never considered whether shackles alone were a sufficient method of restraining Durham, thus seriously undercutting the legitimacy of their determination that Durham must wear the stun belt.

absence of factual findings or consideration of alternative methods of restraint, it is impossible to credit or accept such an explanation. The district court's rationale for imposing this highly intrusive method of restraint is simply not supported by this record, and we therefore conclude that the court abused its discretion in this matter.

## D.

Given that the district court acted outside the scope of its discretion in ordering Durham to wear the stun belt, we must conclude that several of Durham's fundamental rights were unjustly burdened. Our inquiry now turns to whether these burdens on Durham's rights were harmless.

One of Durham's rights that was affected by the error is the right to be present at trial and to participate in his own defense.[10] Once a violation of this right has been established, "[the defendant's] conviction is unconstitutionally tainted and reversal is required unless the State proves the error was harmless beyond a reasonable doubt." *Proffitt v. Wainwright*, 685 F.2d 1227, 1260 n.49 (11th Cir. 1982).

---

[10] Because we find that the district court's error with respect to this right was prejudicial, we need not address any other rights that the imposition of the stun belt may have burdened.

21

When addressing possible prejudice after this type of error has occurred, it is not sufficient for the government to point out that the defendant was represented by an attorney looking out for his interests, thus rendering the defendant's presence or participation at trial unnecessary. Such a claim "ignore[s] the fact that a client's active assistance at trial may be key to an attorney's effective representation of his interests." *United States v. Novaton*, 271 F.3d 968, 1000 (11th Cir 2001). Nor it sufficient for the government to argue that the defendant cannot name any outcome-determinative issues or arguments that would have been raised had he been able to participate at trial. Not only does such an argument impermissibly transfer the burden of proof back to the defendant, but it also would eviscerate the right in all cases where there is strong proof of guilt. *Id*. "The right to be present at one's own trial is not that weak." *Id*. In cases where we have found that the defendant's absence (and hence, inability to participate) was harmless, the defendant generally has been absent for only a brief or minor portion of the trial. *See, e.g., United States v. Boyd*, 131 F.3d 951, 953–54 (11th Cir. 1995) (per curiam) (defendant's absence during evidentiary hearing on motion for new trial harmless); *United States v. Harris*, 908 F.2d 728, 739 (11th Cir. 1990) (brief absence during closing argument harmless); *Hall v. Wainwright*, 805 F.2d 945, 947-48 (11th Cir. 1986) (per curiam) (absence of defendant during brief portion of

jury qualification and during short discussion between judge and jury during deliberations was harmless).

In the instant case, the defendant's ability to participate meaningfully throughout his trial was hampered by the use of the stun belt. The government has not demonstrated that Durham's defense was not harmed by such an impediment to Durham's ability to participate in proceedings. Therefore, Durham's conviction must be vacated, and his case remanded for a new trial.

CONCLUSION

Use of a stun belt as a security device at trial imposes substantial burdens upon a defendant's constitutional rights. The device may interfere with a defendant's right to consult with counsel and right to participate in his own defense. If a stun belt is to be used to restrain a particular defendant, a court must subject that decision to careful scrutiny. This scrutiny should include addressing factual questions related to its operation, the exploration of alternative, less problematic methods of restraint, and a finding that the device is necessary in that particular case for a set of reasons that can be articulated on the record. In the instant case, the district court did not make any factual findings about the belt's operation, nor did it explore or consider alternative methods of restraint. Finally, it did not articulate a sufficient rationale for employing the belt in this case.

Therefore, the district court abused its discretion in ordering Durham to wear the belt. The government has not demonstrated that the burden on Durham's constitutional rights created by this error was harmless. Durham's conviction must be vacated and the case remanded for further proceedings.

VACATED AND REMANDED.

TJOFLAT, Circuit Judge, concurring:

As the court's opinion indicates, the outcome of this appeal turns on the resolution of one issue: whether the district court abused its discretion when it denied appellant's motion to prohibit the use of the stun belt and required appellant to wear it throughout the course of his trial. To resolve this issue, we look over the district judge's shoulder and examine the information before the court at the time the ruling was made. And we ask what it was that prompted the judge to decide that leg shackles would be inadequate – that a stun belt would be necessary if those in the courtroom were to be protected.

Appellant's trial was scheduled to commence on Monday, February 7, 2000. On Friday, February 4, at 4:10 p.m., appellant's attorney filed a "Motion to Prohibit Use of a 'Stun Belt.'" The record does not indicate when the motion was brought to the court's attention. All that the record shows is that the court had the motion before it the following Monday, February 7, after the jury had been selected for appellant's trial.[1] As far as I can tell from the record, this was the court's first notice that the Government planned on restraining appellant with a stun belt. The motion informed the court of the following:

---

[1] Annexed to this opinion is a copy of the transcript of the hearing the court held that Monday morning on appellant's motion to prohibit use of the stun belt.

25

A "stun belt" is a device which is designed to deliver a non-lethal electric shock to the wearer. It is triggered by a remote control device, in the custody of a law enforcement officer. It is designed to cause such incapacitating pain and shock that a defendant cannot control his muscles.

. . .

[The defendant] has not been told what would cause the officer to trigger the belt. He fears that a question of his counsel, an inquiry of the court, a prompt to voice an objection, even a simple request to be heard, might make a trigger-happy deputy U.S. Marshal conclude that he was acting inappropriately and set off the painful device.

. . .

[W]hat sort of device is being proposed[?]
[What are the] *criteria for triggering the device*, including both positive wrongdoing (sudden movements, etc.) and negative ones (failure to respond to a command[?]
[What are the] immediate effects of the receipt of one shock on [an] individual[?]
[What are the] identity, training, and instructions of the deputy or deputies expected to control the remote trigger[?]

. . .

The most commonly-used stun belt device is called a R.E.A.C.T. ("Remotely Electronically Activated Control Technology"), manufactured by StunTech. The belt administers 50,000 to 70,000 volts, the shock is sustained for approximately eight seconds, it is triggered by a hand-held transmitter, and typically causes the recipient to lose control of his limbs, to fall to the ground, and often to defecate or urinate upon himself.

. . .

As one commentator has stated:

"Physical effects are not the only possible consequence of activating the security belt. StunTech's literature promotes the belt to law enforcement officials as necessary 'for total psychological supremacy . . . of

26

potential troublesome prisoners.' . . . [T]he belt's effect on prisoners is, in fact, primarily psychological. Furthermore . . . the belt acts more as a deterrent rather than a means of actual punishment because of the tremendous amount of anxiety that results from wearing a belt that packs a 50,000 to 70,000 volt punch. If the belt's wearer were to focus on the possible pain and humiliation that he would suffer should the belt be activated, he would then be rendered incapable of effectively participating in his defense and thus deprived of his Sixth Amendment right to counsel."

Following this recitation, appellant's motion argued as follows:

By forcing a defendant to wear a stun belt, the [Government] directly interferes with his mental state, inducing extreme fear of receiving 50,000 to 70,000 volts of electricity. There can be no question but that this fear chills the exercise of the defendant's trial rights, including altering his outward appearance and affecting his decision whether or not to testify, his ability to follow the proceedings, the substance of his communication with counsel, and his ability to actively cooperate with and assist counsel. How is a defendant to understand the assurance that he can, for example, consult with counsel, if the assurance comes at the price of unremitting fear and uncertainty that the very act of consultation may be misinterpreted as "inappropriate behavior," and precipitate a shock?

The information contained in this motion is all that the court had before it

when the hearing on appellant's motion to prohibit use of the stun belt began.[2]

---

[2] Following jury selection, the court heard two motions which appellant had filed – the motion relating to the stun belt and a motion to suppress evidence. As page 6 of the transcript of the proceedings indicates, see Appendix, the court heard

With the motion in hand, the court asked appellant's attorney, Mr. White, to proceed. White briefly described the stun belt, stating that, when activated by a "remote control device," it delivered "from 50 to 70 thousand volts of electricity for approximately five to eight seconds," and then said that he was "concerned that [his client was] more concerned about receiving such a jolt than he is about thinking about the testimony and giving me aid and assistance in the defense of his case." Appendix, at 1-2. In short, White reiterated the argument he had made in the motion he had filed the previous Friday afternoon; in addition, he pointed out that his client was already in "leg shackles." Appendix, at 3. The Government's response, by Mr. Knight, provided the court with the reason the government wanted to use a stun belt in addition to the leg shackles. Knight said that (on a date he did not disclose), appellant had attempted to escape from a jail in Tampa, Florida, that he had been contemplating escaping from the Escambia County Jail, where he was currently being held, and that he had a handcuff key in his possession when he was arrested in California (again, on a date he did not disclose).

Mr. White responded to Knight's statement by informing the court that, at the time he first met appellant (following his appointment as appellant's attorney

and disposed of these motions in order.

28

on January 21, 2000) at the Escambia County Jail, appellant was in the general population. They met in the "visiting room," and there were "no shackles, no handcuffs, no extra security." Appendix, at 3. "And now we get to trial and he's shackled. . . . I understand that we need to take security, and that's why he has leg shackles on him. But this stun belt thing is interfering with my ability to communicate and for me to be able to defend him." Appendix, at 3-4.

After entertaining a brief response from Mr. Knight, the court stated that "Mr. Durham has a heightened security risk above average for a criminal trial." Appendix, at 4. It then asked whether there were "alternative ways" to attach the stun belt, other than on the defendant's back. There were none. After being assured by a deputy Marshal that the Marshals were "trained in how it operates," the court stated that "this is a minimal intrusion into the defendant's normal liberties of exercising his arms and sitting in the chair. And I don't find that there is any rational basis for him to be unduly apprehensive so as to in any way interfere with his ability to participate and advise [his attorney] as part of his defense. So the motion is denied." Appendix, at 5-6.

Looking over the judge's shoulder, I find no evidence in the record to suggest, much less establish, that the leg shackles would not have sufficed as a security restraint. Nor do I find anything in the record indicating that the court

even considered the contents of appellant's motion to prohibit the use of the stun

belt.  The motion contained more than counsel's argument; it recited the literature

accompanying StunTech's device and quoted what one commentator had to say

about it:

> Physical effects are not the only possible consequences of
> activating the security belt.  StunTech's literature promotes
> the belt to law enforcement officials as necessary "for total
> psychological supremacy . . . of potential troublesome
> prisoners."  <u>If the belt's wearer were to focus on the possible
> pain and humiliation that he would suffer should the belt be
> activated, he would then be rendered incapable of effectively
> participating in his defense and thus deprived of his Sixth
> Amendment right to counsel</u>.[3]

(emphasis added).

Notably, the Government said nothing – neither in a written response to

appellant's motion nor at the hearing – to dispute these representations concerning

the stun belt's effect.  If these representations are true – and, because the

Government has not refuted them, I accept them as true – then the court's

statement that there was "no rational basis for [appellant] to be unduly

apprehensive so as to in any way interfere with his ability to participate and advise

---

[3] The record does not indicate whether the device employed in this case was a StunTech belt or a stun belt made by another manufacturer.  In that the Government made no response to appellant's motion to prohibit use of the belt, I assume that the device was StunTech's.

30

[counsel] as part of his defense" is clearly erroneous, and requiring appellant to wear the device throughout his trial constituted an abuse of discretion.