**UNITED STATES of America,**

v.

**Jeffery Scott DURHAM, a/k/a William Anthony Dezarn, a/k/a John Lee Pettry, a/k/a Stephen Carney, a/k/a Jeffery Scott Mullins.**

**No. 3:99CR3/RV.**

United States District Court,
N.D. Florida,
Pensacola Division.

Aug. 29, 2002.

**1235**

Elizabeth Timothy, Federal Public Defender, Northern District of Florida, Donald M. Sheehan, Donald M. Sheehan PA, Pensacola, FL, for defendant.

Stephen P. Preisser, U.S. Attorney, Northern District of Florida, Pensacola, FL, for U.S.

### ORDER

VINSON, Chief Judge.

The defendant has filed an amended motion to prohibit the use of a stun belt at trial (doc. 70).

A lengthy evidentiary hearing was held on the defendant's amended motion on August 23, 2002. Defendant Jeffery Scott Durham was present with his attorney, Donald Sheehan, and Assistant United States Attorney Nancy Hess represented the Government. The superseding indictment in this case charges Jeffery Scott Durham with three counts of armed bank robbery, three counts of using and carrying a firearm during a crime of violence, and two counts of possession of a firearm by a convicted felon, all in violation of Title 18, United States Code, Sections 922(g), 924(c), and 2113(a) & (d). Following a jury trial in February of 2000, Durham was convicted of all counts in the indictment. However, the Eleventh Circuit Court of Appeals vacated the convictions and remanded the case for a new trial because it held that an insufficient record had been established to justify the use of a stun belt during trial. *See United States v. Durham,* 287 F.3d 1297 (11th Cir.2002).

Based on the evidence and argument heard during the hearing and the affidavits, memoranda, and other evidence in the record, I conclude that the use of a stun belt is the best possible means available to protect both the security of the courtroom and the constitutional rights of the defendant in this case.

## I. FACTUAL BACKGROUND

It is beyond doubt that Durham possesses a rare combination of skill, ingenuity, cunning, and fearlessness. These characteristics, in conjunction with the challenge he appears to relish in attempting to escape, make this defendant one of the most dangerous and one of the highest escape risks of any defendant to come before this Court. In this case, the defendant has been charged with three armed bank robberies, which were quite violent, even though no one was killed or seriously injured. In one instance, the bank's employees were tied up and held at gunpoint for 45 minutes. The three bank robberies charged in this case involved the successful robbery of a total of over $490,000. In investigating the armed robberies charged in this case, law enforcement has seized a large quantity of weapons, including four automatic assault rifles, a semiautomatic assault rifle, and a grenade launcher; body armor; false identification; and explosives in Durham's possession.

The defendant's dangerousness has only been further substantiated by his actions while in custody. Before being transported to this District, the defendant almost escaped from the Hillsborough County jail where he was being held. While being watched by a guard in the fully-enclosed exercise yard with only one other inmate, Durham surreptitiously slipped out of his leg irons, apparently using a key that he had concealed on his person; scaled an eight foot interior fence topped with razor wire; climbed the low tower where the guard was stationed; and jumped onto the armed guard who was raising his shotgun to fire on Durham. After unsuccessfully attempting to wrestle the gun away from the guard (who managed to throw the gun over a fence to keep it away from Durham), Durham quickly climbed the exterior fence topped with razor wire, made it to the roof, and jumped to the public street below, where he was apprehended by other officers.

Similarly, while in pretrial detention in the Escambia County jail awaiting the first trial before this court, the defendant plotted a detailed escape attempt with other inmates, which included sending specific information to individuals outside the jail on how to successfully smuggle hacksaw blades into the jail via a Fed Ex package. According to the plan, Durham intended to break out the window in his cell, scaling down six floors with 60 feet of bed sheets tied together, taking the female employee at the Subway sandwich restaurant across the street from the jail as hostage, and fleeing in the hostage's vehicle. Durham further planned to hide out in the woods overnight; and the next morning, to take a local veterinarian hostage and obtain money from this hostage's ATM. Furthermore, a fellow inmate in the Pensacola jail informed law enforcement that Durham had made a threat to kill the Assistant United States Attorney ("AUSA") prosecuting his case, and harm his family members. During a search of Durham's cell, law enforcement found the AUSA's home address and telephone number written on the back of Durham's legal papers, with a box and star drawn around the information. An inmate acknowledged that he had agreed to be the "hit" man to kill the AUSA in return for payment from Durham. The two hacksaw blades and Fed Ex package were located in the garage of an accomplice's girlfriend. A detailed letter of instructions was also discovered in the defendant's sister's possession, after having been smuggled out of the jail through legal mail via the defendant's attorney in Tampa.

Durham then was placed on a 15–minute surveillance watch and in solitary confinement at the county jail. A few days later, however, his cell was searched; and it was found that the defendant had broken the

cell's floor drain grate in half and used it as a tool to remove the material around the cell window so that it was easily removable, and to cut the metal barrier covering the window. Approximately three feet of one side and one foot of the other side of the metal barrier had been cut open. The solitary confinement cell was on the first floor, and Durham was very close to being able to escape, despite being under almost constant, 24–hour, surveillance.

Finally, after sentencing in this court and while being held in federal custody by the Bureau of Prisons at USP Leavenworth, a maximum security prison, Durham conceived, planned, and partially executed to completion an intricate escape attempt. During this attempt, Durham managed to get outside of his building and into the center courtyard. After being in an escape status for nearly seven hours, the guards found Durham hiding and waiting for darkness before scaling the wall to the outside. When he was found, the guards located two bags (which he made from pants legs, with drawstrings closing the tops) full of equipment and clothing, which he had fashioned from the most basic of materials.[1]

It also is noteworthy that Durham is in excellent physical condition; and while being in custody, he has been working out in an effort to increase his physical strength. Furthermore, prior to being brought to this District for trial, Durham was being

held in the Bureau of Prison's ADX, the super-maximum security prison located underground in Florence, Colorado. This unit is used only for prisoners determined to be the most dangerous inmates in federal custody and to be the highest escape risk. Durham is aware that, after this trial, he will probably be returned to the ADX institution from which he came. As a result, he undoubtedly realizes that the more-relaxed security of a public courtroom offers him the best possible opportunity for escape. It also appears that several hundred thousand dollars in funds robbed from the banks remains unaccounted for, and individuals who are willing to assist him in escape efforts have been available to the defendant for assistance. The defendant also may again be facing a prison term that will amount to life in prison. Therefore, it does not appear that the threat of additional charges will deter him from further escape attempts. Finally, it is evident that Durham has a history of being able to escape from locked cuffs and take other steps toward escape, even while under direct observation by guards. Redundant or back-up security devices are absolutely necessary to insure that the defendant does not escape.

## II. DISCUSSION

█ The defendant's initial motion to prohibit the use of the stun belt was denied prior to the defendant's original trial. Of course, all of the defendant's escape

1. The following things were found in the bags: an eight inch metal knife; a homemade sheath for the metal knife with a carrying strap; a remarkable three-prong sharpened grappling hook made from locker hangers with approximately 50 feet of rope made out of braided material with knots every two feet for climbing; another similar single prong hook with a strap; a homemade wallet with neck strap; a watch with a homemade cover and velcro band; a piece of paper with telephone numbers and addresses; a long sleeve shirt dyed black; a road map of the Leavenworth area; ace bandages; climbing gloves; a hood that had been dyed grey and made from a long underwear shirt; a homemade lineman's belt to allow one to climb poles and work with both hands; and prison-issued clothes that had been altered to look like civilian clothes. Durham also had taped two mop handles together to make a pole approximately 12 feet long, which he planned to use to reach the steel plates covering the overhead windows.

efforts, except the Leavenworth incident, were fully known to all of the attorneys and to me prior to the original trial. It was apparent that the use of the stun belt, which had been utilized on prior occasions in my court, was a better alternative for courtroom security than requiring the defendant to wear both leg chains and hand chains. However, the Eleventh Circuit reversed and vacated the defendant's conviction based on its determination that the reasons for requiring the stun belt were not adequately set out on the record. The Eleventh Circuit concluded:

> Use of a stun belt as a security device at trial imposes substantial burdens upon a defendant's right to consult with counsel and right to participate in his own defense. If a stun belt is to be used to restrain a particular defendant, a court must subject that decision to careful scrutiny. This scrutiny should include addressing factual questions related to its operation, the exploration of alternative, less problematic methods of restraint, and a finding that the device is necessary in that particular case for a set of reasons that can be articulated on the record.

*United States v. Durham*, 287 F.3d 1297, 1309 (11th Cir.2002). For the record, I set out my findings and reasons for requiring the use of a stun belt at the defendant's trial.

### A. *Stun Belt*

The Eleventh Circuit has directed a district court considering the use of a stun belt to: (1) "make factual findings about the operation of the stun belt, addressing issues such as the criteria for triggering the belt and the possibility of accidental discharge;" (2) "assess whether an essential state interest is served by compelling a particular defendant to wear such a device;" and (3) "consider less restrictive methods of restraint." *Durham, supra*, 287 F.3d at 1306–07. The Eleventh Cir-

cuit specifically noted that the "likelihood of an erroneous discharge of the belt is certainly a factor that needs to be weighed carefully in any decision to employ this technology." *Id.* at 1307. With respect to the triggering of the device, the court should inquire as to what precautions are taken to prevent the device from accidently triggering; and what kind of training is provided to the deputy with the remote trigger. *See id.* In deciding whether less restrictive alternatives are available to prevent escape and ensure the safety of those in the courtroom, the district court should explore whether leg shackles alone or alternative security measures would be sufficient. *See id.* at 1308.

It is clear that a stun belt serves a compelling state interest in ensuring the security of a public courtroom and the dignified administration of justice in an unobtrusive manner. The stun belt worn during court proceedings consists of an approximately four-inch wide elastic band, which is worn around a prisoner's waist and, ordinarily, under his clothing. The stun belt in this case is known as a Remote Electronic Control Technology (REACT) device, manufactured by Stun Tech, Inc. The belt is powered by two nine-volt batteries connected to two contacts, which are applied to the prisoner over the left kidney. When activated by a remote transmitter, the belt discharges 50,000 volts of electricity over 8 seconds causing the wearer to be immobilized. The amperage of the discharge is quite low. The belt is designed to limit the electrical flow to the wearer's shallow muscular structure. As a result, the wearer is immobilized without any electrical effect upon his heart or internal organs. Numerous tests have shown that a stun belt does not cause either short-term or long-term injury to the wearer. The Marshal's Service has reviewed the defendant's medical records and determined that the stun belt does not

pose any health risk to him. Here, a video of the use of the stun belt's activations on numerous volunteers reflects that it causes pain, but plainly is not permanently harmful or cruel and unusual. Moreover, it is proven technology and has been widely used. The stun belt has been used approximately 63,000 times, with only 45 activations. Of those 45 activations, only 11 were accidental, and 7 of those 11 accidental activations occurred before a plastic guard was installed over the activation button. Based on these statistics, I find that the error rate for this device is so exceedingly low to be of no realistic concern. Likewise, the addition of the plastic guard over the switch greatly reduces any risk of accidental activation. Evidence of only one malfunction from an electrical short was introduced, and it appears that the reasons for that malfunction have been corrected by the manufacturer. There is no evidence of any activation causing self-urination or self-defecation, a matter of concern repeatedly identified by the Eleventh Circuit. Therefore, I find from all the evidence that there is practically no risk of malfunction or accidental activation, no threat to the defendant's health, and no likelihood of undue embarrassment or prejudice to the defendant.

The United States Marshal's policy on activating the stun belt is clear. It may only be activated if the detainee: (1) tampers with the belt; (2) fails to comply with verbal orders; (3) attempts to escape; (4) takes any action indicating an attempt to inflict bodily harm; and (5) intentionally attempts to avoid remaining within visual contact of the Deputy Marshal. The defendant testified that he did not intend to do any of those things during trial. Deputy Marshal Ross Hebert, who trains this District's deputies in the use of this device, testified about the extensive training that is given on the use of stun belts, the warnings that the wearer is given before activation, and the specific type of conduct that would cause the device to be triggered. All of these precautions ensure that the operators are extremely careful in their operation of the stun belt and that the defendant knows the type of unacceptable conduct that will cause the device to be triggered.

I also find that less restrictive security measures would not be sufficient in this case, and any available alternative would be much more prejudicial to the defendant. Without the stun belt, it would be necessary to also chain at least one, if not both, of the defendant's arms to his side, a situation which would be nearly impossible to hide from the jury. Moreover, the defendant has demonstrated his ability to quickly free himself from leg irons while under direct observation; and testimony was given that a skilled prisoner, such as the defendant, could pick a lock on leg irons in approximately 7 seconds. Furthermore, without the stun belt, it would be necessary to locate multiple guards within arms-reach of the defendant, which would give the jury the clear impression that unique force is necessary to control the defendant. Several guards within easy hearing distance of counsel table also could infringe on the defendant's ability and willingness to consult with his attorney. For all of these reasons, I find that the use of leg shackles and a stun belt are the best available means to protect the security of the courtroom and the defendant's constitutional rights.

*B. Defendant's Constitutional Rights*

A district court is entitled to discretion in determining whether to physically restrain a criminal defendant. It is the district judge who is "ultimately responsible for ensuring 'the safe, reasonable and orderly progress of trial,' and shackling or otherwise restraining a criminal defendant may occasionally be the only way to achieve this goal." *United States v. Durham*, 287 F.3d 1297, 1303 (11th Cir.2002)

(quoting *United States v. Theriault,* 531 F.2d 281, 284 (5th Cir.1976)). Visible physical restraints should be resorted to as rarely as possible because such restraints may (1) erode the presumption of innocence; (2) confuse the defendant, impair his ability to confer with counsel, and significantly effect his trial strategy; and (3) such restraints may be deemed an affront to the dignity and decorum of the judicial proceedings. *See id.* at 1304 (citing *Zygadlo v. Wainwright,* 720 F.2d 1221, 1223 (11th Cir.1983); *Allen v. Montgomery,* 728 F.2d 1409, 1413 (11th Cir.1984)).

In the case of stun belts, the concern that the restraint will prejudice the defendant is less of a factor than with other methods of restraint because the stun belt is worn underneath the defendant's coat and is out of sight of the jury. However, the Eleventh Circuit has suggested that "[i]f seen, the belt 'may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant.'" *Durham, supra,* 287 F.3d at 1305 (quoting *State v. Flieger,* 91 Wash.App. 236, 955 P.2d 872, 874 (1998)). In this case, I find that the stun belt is well and fully covered by the defendant's coat while both seated and standing, and is not visible or apparent to an observer in the courtroom. Its use in this case poses no prejudice to the defendant. It is worn underneath his coat; and since he will be sitting in a position facing the jury there is no opportunity for the jury to ever see the slight bulge over his left kidney, much less that they would ever know what the defendant was wearing. Even from the side, seated or standing, there is no apparent bulge visible to the observer because of the drape of the coat. I also note that Durham will be wearing leg shackles which are foam-covered to prevent them from making any noise and which are hidden by skirts placed around all of the tables in the courtroom. The jury will not be able to see or hear the leg shackles. As previously noted, without using a stun belt, it would be necessary to chain one, if not both, of the defendant's arms to his side. Such chains are extremely difficult to hide from the jury. I have had several occasions to have them used in trials prior to the introduction of the stun belt in 1996, and based upon such experiences, recognize that immobilizing one or both of the defendant's arms during trial can seriously affect the defendant's comfort and his ability to communicate with his attorney. Therefore, I find that the potential risk of any prejudice posed to the defendant by wearing the stun belt is extremely minimal and much less than other possible alternative security measures.

The Eleventh Circuit's primary concern associated with using a stun belt seems to be the extent to which it may interfere with the defendant's Sixth Amendment and due process rights to be present at trial and to confer with counsel. "The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial—including those movements necessary for effective communication with counsel." *Id.* at 1305. With respect to the defendant's right to be present at the trial, the Eleventh Circuit noted:

> Presence at trial is meaningless if the defendant is unable to follow proceedings or participate in his own defense. Mandatory use of a stun belt implicates this right, because despite the defendant's physical presence in the courtroom, fear of discharge may eviscerate the defendant's ability to take an active role in his own defense.

*Id.* at 1306 n. 7.

I find that the use of a stun belt in this case does not impermissibly impose on the defendant's Sixth Amendment and due process rights to counsel and to be present at his trial. Extensive testimony was giv-

en concerning the training that the Deputy Marshals receive in using this device and concerning the criteria that the defendant is told will warrant a triggering of the device. It is clear that only the most flagrant of actions would actually cause the device to be activated. Moreover, before being activated, the Deputy Marshals will verbally inform the defendant that he needs to correct his behavior. If there is insufficient time to make such a verbal statement, the Deputy Marshal can trigger an electronic tone, which will inform the defendant that he needs to alter his conduct. The device will only be activated after either of these two warnings have been used and the defendant has persisted in a prohibited course of conduct so that it becomes necessary to exercise immediate and dominant control over him.[2]

In addition to personally observing the defendant's meaningful and unrestricted participation in the first trial of this case, I recognize that the defendant was alert and actively participated, and consulted with his counsel throughout this five-hour hearing on August 23, 2002, during which he wore the stun belt. Although the defendant testified that he was unable to concentrate because of the stun belt, it was evident from observing him during the hearing that he was able to, and did, intelligently and meaningfully participate in his defense and with his counsel. No credible evidence was produced to suggest that the defendant was unable to participate in his defense because of this security measure. I also note that the defendant had no apparent difficulty in meaningfully participating in his earlier 3-day trial while wearing the stun belt. My personal observations of other defendants who have worn the stun belt in my courtroom also confirm

that the so-called anxiety factor is either greatly exaggerated or is simply non-existent.

Finally, before permitting the use of a stun belt, the district court must consider the potential that it may be highly detrimental to the dignified administration of justice. As explained by the Eleventh Circuit, a stun belt may be even more offensive to the dignity of the courtroom than shackles. *See id.* at 1306. Based upon the evidence in the record and my nineteen years of experience as a trial judge, I find that the use of a stun belt in this case is the best available security measure to protect the dignity and decorum of the courtroom. Moreover, after watching the video of the reactions of numerous volunteers being subjected to the device, I find that the effect is much preferable to having the defendant become out of control during a court proceeding and have to be physically tackled by deputy marshals, with attendant danger to spectators and all in the courtroom. Therefore, after weighing and balancing all considerations, the use of the stun belt does not pose any serious threat to the dignified administration of justice.[3]

### C. *Defendant's Objections*

The defendant has objected to wearing a stun belt for the following reasons: (1) the device is an unknown health threat to both him and possibly his counsel; (2) the device is subject to malfunction and has an extremely high error rate; (3) his prior conduct in court does not justify such extreme measures; (4) the criteria for activating the device are over-broad and vague; (5) the device is psychologically damaging, even if not activated; and (6) the device interferes with his ability to assist counsel. If it is found that a stun

---

2. Of course, no warning could be given if the defendant acted so quickly and so flagrantly that there was no time to warn him before it became necessary to take him under control.

3. As set out earlier, it is important to note that there is no evidence of any individual actually defecating or urinating on himself as a result of this device being activated.

belt is appropriate, the defendant has requested that he be given a medical evaluation to ensure that the device does not pose any unforseen health problems to him.

The defendant's objections are without merit. First, this device does not pose any health threat to the defendant, who appears to be in excellent physical condition. There is no evidence that he possesses or may possess any of the health conditions that prohibit use of a stun belt. I also find that a further medical examination is not necessary because the defendant's health records regularly maintained by the Bureau of Prisons do not reflect any medical condition that would pose a health risk in this case. Furthermore, the electrical discharge from the belt does not transfer to another person. The video of the device being activated on volunteers showed other parties touching the wearer of the belt during the activation period with no adverse effect. Second, as previously discussed, the actual error rate for this device is insignificantly low, and there was evidence of only one malfunction of this device, which has been corrected.[4] Third, although the defendant is well-mannered in the courtroom, it is clear from his prior escape attempts that he consciously keeps a low profile to induce his guards into complacency. Fourth, the criteria for triggering the device are clear and are fully explained to the defendant before the device is used. Therefore, he is aware that only flagrant prohibited conduct will cause the device to be activated. Fifth, there is no evidence in the record that the device is psychologically damaging to the defendant,

even if not activated. Although it does provide a deterrent effect and can be very painful if activated, such activation does not cause the wearer to lose control of bodily functions or lose consciousness, and it is not psychologically damaging.[5] Finally, based on the defendant's participation in the hearing and in the first trial, as well as all the evidence in the record, I find that the stun belt does not impermissibly interfere with the defendant's ability to assist his attorney and participate in his own defense.

As previously explained, defendant Jeffery Scott Durham is an extremely crafty, dangerous, and calculating individual. He has demonstrated the ability to overcome numerous security measures in the past with amazing ingenuity and fearlessness. It is apparent that the use of leg irons and additional deputy marshals will simply riot be sufficient to ensure the security of the courtroom. Moreover, the use of a stun belt will not prejudice the defendant, interfere with his Sixth Amendment and due process rights, or hamper the dignified administration of justice. The use of the stun belt during this trial is the best available method to insure the security of the courtroom and to protect the defendant's constitutional rights to a fair trial.

## III. CONCLUSION

For the above reasons, the defendant's amended motion to prohibit the use of a stun belt at trial (doc. 70) is DENIED.

---

4. In claiming a high rate of mistaken activations, the defendant focuses on the number of accidental activations compared to the total number of activations. However, the stun belt has been worn approximately 63,000 times, with only 11 accidental activations, which amounts to an error rate of about 0.01746%.

5. While the thought of 50,000 volts may catch the attention of everyone, those knowledgeable in electricity realize that the amperage is a more important gauge of potential to be physically harmful in this type of application, and the discharge amperage in the stun belt is quite low.